[No. 18762. Department One. January 5, 1925.]

BARNHARD'S VEGETABLE BEVERAGE MANUFACTURING COMPANY, *Appellant*, v. CHARLES CALLAHAN *et al.*, *Respondents*.[1]

SUBSCRIPTIONS (2)—CONTRACT—CONSTRUCTION AND OPERATION. A valid stock subscription is not shown by a contract with a manufacturing company signed on behalf of the "business men of B." by a committee of three, as party of the second part, whereby the second party agreed to subscribe for $5,000 of the capital stock of the company, and the company, in the event of the second party's raising the sum of $5,000, agreed to issue the stock and erect a plant; the contract merely being an agreement by the committee to attempt to obtain the desired subscriptions.

Appeal from a judgment of the superior court for Skagit county, Joiner, J., entered December 17, 1923, upon granting a nonsuit, dismissing an action on contract. Affirmed.

*Bryan & Sampley*, for appellant.

*C. J. Henderson* and *Thomas Smith*, for respondents.

BRIDGES, J.—At the conclusion of plaintiff's testimony, the court granted a nonsuit, and subsequently entered a judgment of dismissal.

The suit is based on a written contract which is too long to be here set out in full. In it the party of the first part is the appellant, and the party of the second part is designated as "The Business Men of the Town of Burlington, Skagit County, Washington." A preliminary clause states that the first party is a duly

[1]Reported in 231 Pac. 789.

organized corporation; that it manufactures a vegetable beverage, and that the second party is desirous that the first party's manufacturing plant be located in the town of Burlington. The contract then says:

"Now, therefore, the party of the second part by its duly constituted authorities, and after having taken action and duly authorizing said officers to take such action, do hereby covenant and agree with the party of the first part that the party of the second part, the Business Men of the Town of Burlington, Skagit County, Washington, will, within thirty days from the date of this agreement, subscribe for stock in said corporation to the party of the first part in the sum of $5,000, the party of the first part agreeing to establish its manufacturing plant in said town of Burlington, and to diligently pursue the construction of a suitable manufacturing plant, and facilities for manufacturing the products of said corporation."

It is then stated that the party of the first part has become the owner of the patents for the manufacture of the drinks mentioned, and that the patentee is entitled to a controlling interest in the corporation, and that "it is in accordance with that provision and understanding that in the event the party of the second part herein shall raise the sum of $5,000, that stock be issued out of the corporation" therefor, and that the second party shall have representation on the board of directors. It is stated that the proceeds from the sale of the stock shall be used for the construction of the plant in question. This instrument was duly executed by the first party, the plaintiff in the suit, and by the second party as follows:

"The Business Men of Burlington,
    Skagit County, Washington,
"By Charles Callahan,
    J. L. Chase,
    C. W. Pettit,
"Their duly appointed committee."

The appellant's testimony tended to show that "The Business Men of Burlington" was a voluntary association, or rather. a number of individuals residing in Burlington, who had expressed some interest in the matter of getting the appellant's manufacturing plant located in their town, and had attended one or more meetings of certain citizens called and held in furtherance of that project. There are some thirty defendants in the case. At one of these meetings of the citizens of Burlington, the three persons who signed. the contract as a committee were appointed for the purpose of entering into some kind of a contract or arrangement with the appellant in furtherance of the project of having the latter's plant constructed in Burlington. The testimony does not very clearly show what authority the committee had.

After the contract was executed, certain of the defendants made some effort to obtain agreements from the business men of Burlington to purchase some of the stock in the appellant's corporation. But little headway was made, however, in this respect. Indeed, we believe there was no written subscription or agreement to purchase stock, and probably only one or two oral agreements. In any event, the matter of raising the $5,000 succeeded only to the extent of a very few hundred dollars. At one time the appellant inquired of some one or more of the defendants as to whom the stock was to be issued under the contract, and a list of names was handed to him; but none of the persons on the list had actually subscribed for any stock or agreed to pay any moneys. Evidently the paper contained a list of prospective purchasers. Appellant, apparently assuming that the persons whose names were on this list would subscribe for stock, or would pay for a certain number of shares, issued to each of such persons a certain number of shares, and delivered them

to a bank in Burlington, with instructions to deliver to the persons entitled thereto upon payment being made therefor at par. None of these certificates were taken up, and when this suit was commenced they were still in the possession of the bank. At the time of making their answers, the attorneys for the defendants obtained these certificates of stock and tendered them to the appellant, and upon its refusal to receive them, filed them with the clerk of the court, where apparently they now are. It is shown that the appellant made some arrangement looking to the construction of its plant in Burlington. It obtained certain figures as to the cost thereof, bought or traded in capital stock for a lot, and had some building material delivered there, which was never paid for.

We think the trial court was right in granting the nonsuit and in dismissing the action. Reading the contract in the light of all of the circumstances under which it was executed, it seems plain to us that the intention of the committee representing the business men was to agree to undertake to raise $5,000 for the purchase of capital stock of the appellant company. Certainly there is nothing to show that the committee had any authority from the business men of Burlington to bind them individually by any agreement to purchase stock. The contract itself strongly bears out this construction, for it expressly says that the business men of Burlington "will within thirty days from the date of this agreement subscribe for stock" in the appellant corporation. This can mean nothing more nor less than that the committee, pretending to represent the business men, agreed to undertake within the next thirty days to get the desired subscriptions. This idea is even more forcibly brought out by another clause of the contract, which says that "in the event that the party of the second part herein shall raise the

said sum of $5,000,    .    .    ." certain things will be done.

Appellant greatly relies upon the case of *Strong v. Eldridge,* 8 Wash. 595, 36 Pac. 696. There suit was brought upon the following writing:

"Seahome, Washington, ........................................, 189......
  "I agree to subscribe $1,500 towards getting the foundry at Fairhaven.
    "E. Eldridge, for Eldridge & Bartlett."

It appeared that the people of Fairhaven were desirous of having a certain known foundry located in that city, and they were obtaining subscriptions to that end. We held that the words "I agree to subscribe" were intended to mean "I agree to pay." In speaking of the matter we said:

"And whether they did so agree must be ascertained from a fair and rational interpretation of the words actually used, when viewed in the light of surrounding facts and circumstances."

Standing alone, the contract in question here might be given the same construction as the one in the *Eldridge* case. It was the surrounding circumstances in that case that induced the holding we made, just as the surrounding circumstances in this case induce the holding we have here made.

Suppose we should accept appellant's view of the contract, what kind of a judgment could be entered? Certainly each defendant would not be liable for the whole $5,000. There is nothing in the contract to justify such a recovery, and if no defendant is to be held to that sum, then for what sum will he be held? There is nothing in the contract and nothing in the testimony to indicate the amount of liability of any defendant.

We are confident that, so far as this written contract is concerned, it is not a subscription, but at most an

agreement to subscribe, and more probably, when all of the circumstances are taken into consideration, an agreement to undertake to get subscriptions.

But appellant contends that, even if the suit cannot be maintained on the written contract, it can be maintained as for a debt due from each defendant in payment for the number of shares of stock which were issued to him, as we have hereinbefore stated. If these several defendants to whom the stock was issued had agreed to purchase it, or if they had personally accepted the stock and retained it, then it is probable that the action could be maintained; but none of them ever agreed to take the stock issued in his name, and no one of them ever received or retained the stock, and so far as we can learn from the evidence, not more than two or three of them knew that the stock had been issued. The testimony of the appellant's president bears out this theory, because he said that, while the stock was issued to these several defendants, it was understood that it would not be delivered until it had been paid for.

We are confident that the ruling of the trial court was correct.

The judgment is affirmed.

MAIN, C. J., TOLMAN, MITCHELL, and PARKER, JJ., concur.